1  ROGER N. GOLDEN (SBN 61294) Email: rngolden@earthlink.net
ROGER N. GOLDEN, A Professional Corporation
2  6303 Owensmouth Ave, 10th Floor
Woodland Hills, CA 91367
3  Telephone:    (818) 707-1528

4  DAVID B. GOLUBCHIK (SBN 185520) Email: dbg@lnbrb.com
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
5  10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
6  Telephone: (310) 229-1234
Facsimile: (310) 229-1244

7
Attorneys For Plaintiff
8

9              UNITED STATES BANKRUPTCY COURT
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
10                 LOS ANGELES DIVISION

11

12  IN RE:                          Case No. 2:08-bk-27142-SB

13  CARSON HOM, an individual       CHAPTER 7

14       Debtor

15  AMAY'S BAKERY & NOODLE CO., INC.,   Adv No. 09-01027-SB

16       Plaintiff,                 **NOTICE OF SUBMISSION OF**
                                    **EXPERT'S REPORT IN**
17  Vs.                             **CONNECTION WITH CONTINUED**
                                    **PRE-TRIAL CONFERENCE**
18  CARSON HOM,

19       Defendant.                 Hearing:
                                    Date:  May 18, 2010
20                                  Time:   2:00 p.m.
                                    Place:  Courtroom 1575
21

22

23

24

25

1

**PLEASE TAKE NOTICE** that attached hereto as Exhibit "A" is a true and correct

copy of Amay's Bakery & Noodle Company, Inc.'s expert report prepared by Yunxiang

Yan in connection with the upcoming trial in the above-referenced adversary proceeding.

Dated: May 3, 2010                          ROGER N. GOLDEN, a Professional Corp.
                                            and
                                            LEVENE, NEALE, BENDER, RANKIN
                                            & BRILL L.L.P.


                                            By: _____
                                                DAVID B. GOLUBCHIK
                                                Attorneys for Plaintiff

# EXHIBIT A

## MEMORANDUM OF OPINION

Date:   April 30, 2010

To:     Mr. Roger Golden, of Roger N. Golden, A Professional Corporation

Fr:     Yunxiang Yan, Department of Anthropology, UCLA

Re:     Cultural Imperatives in the cases of Carson Hom and Janet Hom

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### INTRODUCTION

I, the undersigned, Yunxiang Yan, was retained by Roger N. Golden, a

Professional Corporation to provide an opinion regarding the existence of and factual

basis for the a cultural imperative defense asserted by Carson Hom (hereinafter Carson)

and Janet Hom (Janet) in their respective declarations filed on November 30, 2009 in

connection with the non-dischargability action brought against them by Amay's Bakery

& Noodle Co., Inc. (hereinafter Amay's).

I have reviewed the declarations of Janet and Carson, their respective depositions

taken on February 5, 2010, the Statement of Intended Decision filed in Los Angeles

Superior Court Case No. BC 251520 and the Statement of Decision filed in Los Angeles

Superior Court Case No. BC 322221. I have also examined relevant literature in the field

of Chinese family, kinship, and social change.

As more fully set forth in my curriculum vitae attached hereto as Exhibit A, I am

a professor in the UCLA Department of anthropology. I specialize in the research areas

of Chinese family, kinship, social change, and individual-society relationship. In the

-1-

following, I will first summarize my opinion and then set forth, in detail, the basis for my

evaluations of Carson's and Janet's cultural imperative argument. I will do so by placing

their claim in the context of traditional Chinese culture and then examine their

understanding of the true cultural imperative which forms the familial and social

foundation for Chinese culture.

## SUMMARY STATEMENT OF OPINION

As more explicitly set forth below, in my opinion, Carson's and Janet's claim of

the cultural imperative of unconditional obedience to parents is entirely ungrounded

simply because there is no such a cultural imperative per se in traditional Chinese culture.

Their misplaced assertion of cultural imperative under circumstances of this matter and

their clear lack of understanding of Chinese culture demonstrate that neither of them was

operating under any cultural compulsion nor moral duty of traditional Chinese culture to

obey their father when they engaged in the actions with respect to which judgment was

entered against them. What can be clearly seen in their depositions, however, is the

strong influence of American individualism on both Carson's and Janet's mindset.

## THE INCORRECT CULTURAL CLAIM

Both Carson and Janet assert in their declaration that they had no choice but to

obey whatever their father told them to do in both business and family affairs because of

a cultural imperative that requires their unconditional obedience to their father. In their

own words:

–2–

"At this juncture, it is important to note that it is a cultural imperative of

traditional Chinese culture that children do not disobey their elders, and

especially one's parents. I was raised with these values, and it would not

have occurred, and did not occur, to me to disobey my father in anything

involving family affairs. In particular, I did not in my mind separate the

family's business activities from other family matters inasmuch as these

matters were intertwined and mixed together as part of the broader family

milieu at our regular gatherings" (paragraph 10, page 4, Declaration of

Janet Hom; an identical paragraph is found in paragraph 10, page 4,

Declaration of Carson Hom).

When their depositions were taken in Feb. 2010, Carson and Janet reconfirmed

this cultural claim but provided little further explanation except repeating the same

cultural imperative.

What Carson and Janet did not realize is that there is no such a cultural imperative

per se in traditional Chinese culture. It is true that in traditional Chinese society the

relationship between parents and children was hierarchal in nature, that parents or senior

kinsmen enjoyed superior status and power over children or junior kinsmen, and that

parental authority played an important role in family life. But, respecting and obeying

one's parents and/or elders was merely part of this familial culture, not a cultural

imperative in its own right; it was always perceived and performed as part of *xiao* (or

*xiaoshun* or *xiaojing* in various local dialects), an important cultural imperative that has

been commonly translated into English as "filial piety."

The Chinese notion of filial piety is the corner stone of traditional Chinese ethics which is understood as Confucian ethics due to the predominant influence of Confucianism in ethical discourse in China. It serves to support the basic belief in patriarchal authority and is internalized during childhood socialization through dependence on primary domestic group. The classic discourse on filial piety originated from Confucius (551-479 B.C.), one of the founding fathers of Chinese thought, ethics, and cultural imperatives. In his book Analects, Confucius laid out three fundamental principles of filial piety: (1) children should treat parents and other elders with respect and do their best to follow the instructions from parents and other elders; (2) children should satisfy the needs of parents and other elders and provide financial security and emotional support to aging parents and grandparents; (3) children should also perpetuate the descent line through marriage and cultivate moral merits in parents-children relationship by observing the proprieties of benevolence and righteousness.

These three principles of filial piety mutually reinforce one another and must be considered together when we discuss the cultural imperative of filial piety. Self sacrifice provides the golden thread that links the three components together. The ultimate goal is for the security and prosperity of the group—ranging from the family and the lineage to the imperial state—instead of the immediate gratification of the individual. It is in this sense that traditional Chinese culture and morality appear to be quite different from the American counterpart that is based on individualism and a set of natural rights of the individual.

Treating parents and elders with respect, observance, and obedience in many circumstance, however, is just one aspect of filial piety and it must be complimented with

–4–

the other two, that is, economically providing elderly support and morally cultivating the goodness of both parties. To fulfill one's filial duties, one must not blindly follow the order of parents or other elders if the latter are morally wrong; moreover, one is obligated help one's parents or elders to correct their immoral behavior so that both parties could be morally good, as shown in both the classic and popular moral teaching.

In Analects, Confucius noted that it was the responsibility of children to repeatedly remonstrate to parents if they found their parents are wrong. But because of the moral and social hierarchy, the children must show their respect while expostulating with parents.[1]

According to The Book of Filial Piety, which is THE classic specifically written for the cultural imperative of filial piety, Zengzi, one of Confucius' students, trying to clarify the filial responsibilities of both respecting parents and remonstrating parents, asked Confucius: "Didn't you say that obeying the order of father is filial piety?" Deeply troubled by this idea of Zengzi, Confucius responded strongly: "Nonsense! Nonsense! If one's father is wrong, and one follows the father's order, this person simply pushes his father into the worst situation of moral guilt and shame—the lack of righteousness." Confucius went on to demonstrate his point by providing several examples and finally concluded: "therefore, whenever one sees the father is morally wrong one must expostulate with his father. Simply following father's order is by no means filial piety."[2]

This third component of filial piety, that is, doing one's best to protect parents and elders' moral integrity has been continuously elaborated by both the elite and the common folks in various forms since Confucius' time. For example, Mencius, the well-respected sage after Confucius, pointed out that there are three sinful violations of filial

piety; the first of them is the children's fawning on and unprincipled obedience to parents
that could push parents into immorality.[3] In the popular pamphlet <u>Behavior Norms of
Children</u> which has been used as pre-school reading for children's moral education since
the early 18th century, the moral norms state clearly that when parents made mistakes or
doing morally wrong things, children must admonish their parents about moral principles.
But they must do so with gentility, kindness, softness, and smiling face; if the parents
refuse to take the advice, the children must wait to remonstrate again when parents seem
to be happier; if still no effect, children should beg parents to correct their behavior with
tears and should not complain if parents felt offended and started to beat up the children.[4]

Both the classic canons of Confucianism and the popular moral teachings in
traditional China state clearly: (1) there is no such a cultural imperative that simply
demands children's blind and unconditional obedience to parents or other elders; and (2)
on the contrary, children have the moral duties to remonstrate with parents and find the
most respectful ways to correct them if the parents are morally wrong. Therefore,
obedience to parents is not unconditional and must be guided by moral principles of
higher order. This is summarized by Xunzi, the third most important figure in
Confucianism, as "following the moral principle of righteousness, not the father, is the
greatest virtue of human being."[5]

How should one understand and practice the moral duty of respecting and
rightfully obeying parents? The answer is to regard the duty as one of the three
components of the cultural imperative of filial piety and to act in accordance with all
three principles. Again, the above-mentioned popular pamphlet <u>Behavior Norms for
Children</u> gives the most accessible explanation as the following: A good and morally

sound person must respect parents, listen to parents, make all kinds of self-sacrifice to meet parents' needs, take care of parents when they are sick or in old age, expostulate with parents when they are morally wrong and correct their mistakes in the most respect and humble way, provide elaborate funeral at the end of their life, and continue to respect and take care of them as ancestors afterwards.[6]

To reiterate the research findings above, traditional Chinese culture does not requires an adult child's unconditional obedience to his or her parents because the moral principle of higher order, namely, benevolence and righteousness, overrules parental authority if the parents are morally wrong. Moreover, remonstrating with parents when they are morally wrong is a moral duty on the children's side and also part of the cultural imperative of filial piety. There is no evidence at all in both classic canons and popular moral teachings that support Carson's and Janet's claim of an imperative of unconditional obedience to parents in traditional Chinese culture. This claim by Carson and Janet, in my opinion, is not only false due to the non-existence of such a cultural imperative but also a distortion of traditional Chinese culture because it contradicts the actually existing imperative of filial piety.

Carson's and Janet's groundless claim and by way of it their distortion of traditional Chinese culture very likely derive from their lack of understanding of traditional Chinese culture and their ignorance of core values in traditional Chinese family. Their shortage of cultural knowledge about China is further confirmed by their deposition testimony in which neither of them mentioned the Chinese notion of *xiao* or filial piety. It is a surprise to me that neither Carson nor Janet use the notion of filial piety to make their cultural defense claim, and it is even more astonishing that none of

–7–

them brought up the notion when they were asked by Mr. Roger Golden to explain the cultural origin of parental authority in traditional China.

In mainland China, Taiwan or Hong Kong, filial piety is the most common term used to talk about parents-children relationship in daily conversation and formal discussion alike. Virtually everyone growing up in a Chinese cultural setting is familiar with this cultural value and can explain in one way or another how it works as a cultural imperative in guiding people's behavior in everyday life.

Since 1994, I have regularly taught the following three courses about Chinese culture at the Johns Hopkins University and UCLA respectively: the undergraduate seminar "Chinese Family and Kinship," the graduate seminar "The Anthropology of China," and the undergraduate lecture course "Ideology and Social Change in Contemporary China." Hundreds of students have taken these classes with me during the last 16 years. The discussion on filial piety, parental authority and family culture always featured conspicuously in my teaching and classroom discussions. From interacting with these students over these years, I observed that Chinese-American students whose socialization process was influenced by Chinese culture all understand the notion of filial piety well, sometimes even better than students from mainland China because filial piety was once attacked as a feudalistic vale under Maoism there. Students who are interested in Chinese culture were interested in learning these core values in Chinese culture, and by the end of the class they all obtained certain knowledge and could understand the complicate meanings of filial piety to a certain extent, at least knowing its central importance in traditional Chinese culture. This is why I was actually surprised by Carson's and Janet's ignorance of filial piety, which makes me wonder if they are truly

-8-

influenced by Chinese culture when they were growing up. When I turn to their deposition testimonies for answers, I found little evidence of the influence of traditional Chinese culture on their mentality and behavior.

### THE LACK OF CHINESE CULTURAL INFULUENCE

In their depositions, Carson and Janet revealed their ignorance of traditional Chinese culture. When being asked what books they read, what courses on Chinese culture they took, their answers are basically a straight "none." None of them could explain what Confucianism is, much less the core values of traditional Chinese culture. Janet did not even know who Confucius is! They both claimed they learned Chinese values from friends, but only a very few individuals whom they could identify as ethic Chinese. It is also interesting that in most occasions they use the word "Asian values" or "Asian culture" to refer to Chinese values and culture, overlooking the vast differences among various Asian cultures and societies. Unable to identify any source of Chinese values they learned in schools or public life, both Carson and Janet turned to their life experiences of being brought up as Chinese kids at home. However, none of them could identify any specific cultural value that they learned, except for the demand to obey parents.

Is it true that by virtue of their growing up in a Chinese-American family Carson and Janet would have learned and absorbed the values and norms of traditional Chinese culture? Is it self-evident that living in the house of their father would have necessarily made Carson and Janet unconditional obedient to their father? The answers are clearly

–9–

negative when we measure their accounts of their own thought and behavior against the widely recognized features of traditional Chinese culture.

In real life the interactions between parents and children are dynamic and consistently changing as both parties go through the life course cycle. In general, childhood is the period in which a young child is not only supposed to listen to and obey the orders of parents, but also has not much choice in both moral and practical terms. In youthhood, a growing-up youngster begins to have her/his own opinions and own ways of doing things, which may be in conflicts with that of parents, known as generational gap. The generational gap is particularly relevant in modern times and especially important in immigrant families because the rapidly changing social environment widens the generational gap and makes it easier for the younger generation to adapt. In adulthood, the grownup child begins to have more power in economic, social, and moral terms, and the previous power balance in parent-child relationship is likely shifted to favor the adult child. Again, this is particularly relevant to immigrant families in the US because the adult children who were born in the US would have additional language and cultural advantages over their parents. Finally, when the adult children reaches to middle age they tend to gain even more power over their parents as the latter will soon rely on the adult children to provide emotional support, daily caring, and in many families financial security as well.

To cope with the changing power balance caused by both life cycle and social changes in large settings, in traditional Chinese culture parents must do their best to cultivate and maintain their authority so that they will continuously be respected and supported by their children even when they enter old age. In general, four strategies are

-10-

commonly used and have proved to be effective in keeping the power of cultural imperative of filial piety to its maximum.

The first is moral teaching which normally started in one's childhood. The cultural values, behavior norms, and moral principles regarding filial piety that were examined above are embedded in folk songs, fairy tales, local legends, performances in country fair or local markets, family visits, gossips, daily informal teachings, and formal schooling. The central message in all these forms of moral teaching is filial piety, and as a child grows up, she or he would have heard of the message hundred of thousands times in a large variety of forms and would perceive parental authority as a natural existence and filial piety as intrinsic to one's being.

The second strategy is to lead by example. Most Chinese parents are extremely careful about the impact of their words and actions on the state of mind of their children and mindful of the power of moral example when they fulfill the duties of filial piety to their own parents (the grandparents) in front of their children. By virtue of being exemplary in their own behavior, parents establish their authority and power and instill these into children's mindset during the process of socialization, and the children will do the same when they grow up. The end result is the maintenance of parental authority and filial piety from one generation to the next. Such a strategy is also reinforced by negative cases in which the unfilial parents later are abused by their own children. Therefore, it is widely agreed among the Chinese people that if the parents are not filial to their own parents (i.e., the grandparents), the children would certainly repeat the same pattern because they simply learned and copied the immoral behavior of the parents.

–11–

Thirdly, the structure of household economy in traditional China also helped to strengthen parental authority and, implicitly, to obligate adult children to perform their duties of filial piety. The traditional Chinese family functions like a corporate organization and economically is characterized by a common budget, shared property, and a household economy with a strict pooling of income. There is no individually owned property per se; instead, the family group owns the property collectively. Family-owned property serves as the most important mechanism to shape the actions of family members. Individual members all work for the family group and put their income in the same pool, which will be controlled and managed by the family head and his wife. The family head, normally the most senior male, serves as both the representative and manager of the family group and has the power to use the pooled family income and allocate resources in everyday life based on a carefully designed household budget. When the most senior male dies, the family estate is divided equally among all sons who will start off their own independent household economy from that point on. This is a highly ritualized process called family division. The family head's monopoly of economic resources helps to cultivate the virtue of filial piety and parental authority, because unfilial sons could be deprived their inheritance rights at the time of family division.

Finally, in everyday life, verbal and physical punishments are also used to cultivate and maintain parental authority and, to a certain extent, reinforce the moral teaching of filial piety. This is particularly true in the early stages of a parents-children relationship, coinciding with parents' one-way demand of submission and obedience from young children. Scolding is not uncommon when moral teaching fails, and physical

–12–

punishment is widely used when young children disobey parents. However, parental usage of verbal and physical punishments decrease when children become adult and the power balance begins to shift in favor of children.

Turning to the socialization experiences of both Carson and Janet, or what they refer to as learning from their up-brings at home, I cannot detect any of the above four mechanisms of teaching, learning, maintaining, and reinforcing the cultural imperative of filial piety. First, Carson and Janet could not identify any specific moral teaching about filial piety or other core values of traditional Chinese culture from their parents or other family members. The only moral teaching that Janet could remember is the commentary from her neighbors that a child should be "guai," meaning to listen to parents and/or adults. This is a common, almost universal, teaching of socialization from parents to young children when the latter are too young to make their own decisions or act independently. It is a cultural value, but not uniquely traditional Chinese.

Second, Carson and Janet could not provide any example of moral teaching by example by their father. Instead, their father's behavior, especially the way he treated his own father (the grandfather of Carson's and Janet's) stands as the opposite example to filial piety in particular and traditional Chinese culture in general. For example, the vary act that their father wanted to buy stock shares from their grandfather only 10 days after the death of their grandmother is extremely unfilial by the standard of traditional Chinese culture. If the strategy of leading by example were working in this family, what Carson and Janet could learn would be the violation, instead of the observance, of the cultural imperative of filial piety.

--13--

Third, the various family businesses in the Hom family group have been established and operated in mostly contemporary and Western ways. None of the core features of family business in traditional Chinese culture, namely, a common budget, collective right of family property, and strict pooling of income from all family members, can be found in the Hom family group. This could explain the lack of parental authority in the senior generation as Carson's and Janet's father has long been quite independent and powerful in dealing with either family business or with his own father. By the same token, the cultural imperative of filial piety did not have any economic backup in this family group; therefore, when moral teaching and leading by example were absent, there was hardly anything else to transmit and reinforce this cultural imperative to the junior generation in this family group, except the fourth strategy, that is, punishment in verbal or physical forms.

But, teaching filial piety by punishment alone would not work even in traditional Chinese culture and therefore it was always regarded as the last resort. It would be more difficult to practice in the context of immigrant families in the US because of the moral teaching, social norms, formal education, and laws in American society are all against physical punishment of children. This element of immigrant family is more relevant if one take into consideration the simple facts that Carson and Janet were born in the US, grew up in the much open and liberal social environment of California in the post civil rights movement era and their father can only speak broken English (in accordance with Janet's deposition). It is no wonder that in their deposition neither Carson nor Janet could recall any incident of being taught to obey parents by the method of verbal or physical punishment.

-14-

In short, because both Carson and Janet are US-born and have received formal

college education, they are obviously much better informed and more knowledgeable

than their father. The only possibility that they could yield to their father's authority is to

be conditioned and compelled by moral teachings of traditional Chinese culture through

the above-mentioned four mechanisms. Yet, their deposition testimonies have shown no

evidence of the influence of traditional Chinese culture in this regard.

## THE INFLUENCE OF AMERICAN INDIVIDUALISM

Ironically and interestingly, if one takes a closer look at their descriptions of

childhood and youthhood experiences at home, the opposite might be truer, that is, both

Carson and Janet grew up with considerable freedom, choice, and independence, not

much different from a typical middle-class American kid. For example, when being

asked whether they ever disobey their father by Mr. Roger Golden, Carson and Janet all

said "yes" and all provided examples of not doing household chores against their father's

will, such as not to taking care of the swimming pool. Their excuse was that they were

too busy doing their own things. They might have thought these examples are too trivial

to show anything important, but, unfortunately, these seemingly minor incidents did tell

us a lot about whether they were under pressure of traditional Chinese culture to obey

their father or not. More importantly, these examples also reveal how they understood

children's duty to obey parents' demand. As indicated above, the core of filial piety in

traditional Chinese culture is to make all kinds of self-sacrifice in order to meet the needs

of parents or the family group. Most of these efforts of self-sacrifice are small and slight

in everyday life. It does not matter if it is doing a routine household chore or carrying out

–15–

an important business task, the bottom line is one should not and must not put one's own

interest above that of the parents and the family group. Therefore, unless the parents are

morally wrong, one is obligated to happily and gently take the parental order and

complete the work. It is interesting that in the examples that they provided Carson and

Janet behaved precisely like the more individualistic American youth who know they are

entitled to do their own things, control their own time, and value their own interest first.

By this logic of individualism, the excuse of having no time could be sufficient and good

enough for Carson and Janet to disobey their father.

        In another example, Janet told Mr. Golden that she did not water the plants and

the plants died. Mr. Golden asked her what the consequence was. Janet replied that there

was no consequence. This is, I must point out, very non-Chinese. There would and

should be some consequences if this incident were to take place in a Chinese family,

especially a family with traditional Chinese values because it is evidence of the failure of

filial piety on both sides. The child failed to fulfill her moral duty, but the father or

parents were also at fault because they failed to teach the virtue of filial piety. The

consequence could vary from one family to another, involving moral teaching, self-

criticism, scolding, or even physical punishment of the child; but there is no way a parent

would let it go without any consequence. This small incident shows once again that

Carson and Janet received very little moral teaching of traditional Chinese culture at

home and they grew up not much different from typical American kids and youths in the

US. Therefore, they have a strong entitlement toward their individual rights, interest, and

instant gratification, and they would not hesitate to refuse take orders from parents, much

less making self-sacrifice for their parents.

## CONCLUDING REMARKS

In a nutshell, I conclude that there is no ground at all for Carson and Janet to make the cultural imperative claim in their defense, because of (1) the non-existence of such a cultural imperative that requires children's unconditional obedience to parents; (2) Carson's and Janet's ignorance of filial piety which is the most important cultural imperative that guides and governs children-parents relationship; (3) their lack of knowledge and understanding of traditional Chinese culture in general; and (4) their expression of American individualism throughout their depositions. All of these evidences clearly contradict Carson's and Janet's claim that they merely followed a cultural imperative of traditional Chinese culture to obey their father and to carried out the actions in dealing with Amay's.

---

[1] Analetcs (*Lun Yu*), Chapter "*Li Ren.*"

[2] The Book of Filial Piety (*Xiao Jing*) Chapter "*Jian Zheng.*"

[3] Mencious (*Meng Zi*), Chapter "*Li Lou*, part 1.*"

[4] Behaviour Norms of Children (*Di Zi Gui*), Chapter "*Ru Ce Xiao.*"

[5] Xunzi (*Xunzi*), Chapter "*Zi Dao.*"

[6] Behaviour Norms of Children (*Di Zi Gui*), Chapter "*Ru Ce Xiao.*"

Appendix 1

## INFORMATION AND SOURCES

In reaching the conclusion set forth in my memorandom of opinion, I relied upon

the following information and sources:

INTERNAL SOURCES OF INFORMATION

1.  Statement of Decision dated July 11, 2008, issued by Judge Hiroshigi in the

Los Angeles Superior Court case entitled Amay=s Bakery & Noodle Co., Inc. vs.

Asiacorp, Inc., et al, Case No.  BC 322221;

2.  Statement of Intended Decision dated April 7, 2005, issued by Judge Chirlin in

the Los Angeles Superior Court case entitled Amay=s Bakery & Noodle Co., Inc. vs.

Leung On Hom, et al, Case No.  BC 251520;

3.  Deposition of Carson Hom taken in this matter on February 5, 2010;

4.  Deposition of Janet Hom taken in this matter on February 5, 2010

EXTERNAL DOCUMENTS AND SOURCES

Aries, Philippe. 1962. Centuries of Childhood: A Social History of Family Life.  New
York: Vintage Books.

Baker, Hugh. 1979. Chinese Family and Kinship. New York: Columbia University Press.

Chan, Alan Kam-leung and Tan Sor-hoon (eds.). 2004. Filial Piety in Chinese Thought
and History. London; Routledge.

Chen, Albert Y. 2006. "The Effects of Filial Piety on Asian American Care-giving and
Emotional Stress." M A thesis, California State University Fullerton.

1

Cohen, Myron L. 1970. "Developmental Process in the Chinese Domestic Group." In

Maurice Freedman (ed.) Family and Kinship in Chinese Society, pp. 21-36.

Stanford: Stanford University Press.

_____. 1976. House United, House Divided: The Chinese Family in Taiwan, New York:

Columbia University Press.

_____. 1992. "Family Management and Family Division in Contemporary Rural China."

China Quarterly, no. 130: 357-377.

Deng Weizhi. 1994. Jindai Zhongguo Jiating de Biange (Family Change in Modern

China). Shanghai: Shanghai Renmin Chubanshe.

Driscoll, Richard, Keith Davis, and Milton Lipetz. 1972. "Parental Interference and

Romantic Love: The Romeo and Juliet Effect." Journal of Personality and Social

Psychology 24(1)): 1-10.

Freedman, Maurice. 1966. Chinese Lineage and Society: Fukien and Kwangtung.

London: Athlone.

_____. 1979 [original 1961]. "The Family in China, Past and Present." In G. William

Skinner (ed.). The Study of Chinese Society: Essays by Maurice Freedman. pp.

273-295. Stanford: Stanford University Press.

Gallin, Bernard and Rita Gallin. 1982. "The Chinese Joint Family in Changing Rural

Taiwan." In Sidney Greenblatt, Richard Wilson, and Amy Auerbacher Wilson

(eds.). Social Interaction in Chinese Society. New York: Praeger.

Guo, Yuhua. 2001. "Daiji guanxi zhong de gongping luoji jiqi bianqian: dui hebei

nongcun yangtao shijian de fenxi" (The logic of fairness and its change in cross-

generational relations: an analysis of cases of elderly support in rural Hebei),

2

Zhongguo xueshu (The Chinese Scholarship), no. 4, pp. 221-254.

Hu, Hsien-chin. 1944. "The Chinese Concept of Face." American Anthropologist 46:45-64.

Hwang, Kwang-Kuo. 1999. "Filial Piety and Loyalty: Two Types of Social Identification in Confucianism," Asian Journal of Social Psychology 2 (1): 163-183.

Knapp, Keith Nathaniel. 2005. Selfless Offspring: Filial Children and Social Order in Early Medieval China. Honolulu: University of Hawai'i Press

Ikels, Charlotte (ed.). Filial Piety: Practice and Discourse in Contemporary East Asia. Stanford: Stanford University Press.

Pham, Van T. 2002. "Filial Piety and individual Freedom : Confucian Ethics and Gender Relations as Seen Through Two Vietnamese Novels." Ph.D. dissertation, Catholic University of America.

Sheu, Shuh-Jen. 1997. "Filial piety (hsiao) and Filial Care-giving Experiences of Chinese Families in the San Francisco Bay Area." Doctoral thesis in Nursing, University of California San Francisco.

Song Jian. 2006. Zhongguo nongcun renkou de shouru yu yanglao (Income and Elderly Support among the Rural Population in China). Beijing: Zhongguo renmin daxue chubanshe.

Traylor, Kenneth L. 1988. Chinese Filial Piety. Bloomington, IN: Eastern Press.

Yan, Yunxiang. 2003. Private Life under Socialism: Love, Intimacy, and Family Change in a Chinese Village, 1949-1999. Stanford: Stanford University Press.

_____. 2009 The Individualization of Chinese Society. Oxford: Berg.

Zhang, Jianxin and Michael Harris Bond.1998. "Personality and Filial Piety among

3

College Students in Two Chinese Societies: The Added Value of Indigenous

Constructs." Journal of Cross-Cultural Psychology 29 (3): 402-417.

Zhou, Min. 2009. Contemporary Chinese America: Immigration, Ethnicity, and

Community Transformation. Philadelphia: Temple University Press.

| In re:<br>CARSON HOM,<br>AMAY'S BAKERY & NOODLE CO., INC.,<br><div align="right">Debtor(s).</div> | CHAPTER  11<br><br>CASE NUMBER  2:08-bk-27142-SB<br>ADVERSARY NUMBER 09-0127-SB |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

The document described as: **NOTICE OF SUBMISSION OF EXPERT'S REPORT IN CONNECTION WITH CONTINUED PRE-TRIAL CONFERENCE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 3, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

   * David B Golubchik     dbg@lnbrb.com
   * Steven A Schwaber     schwaberlaw@sbcglobal.net, sasecf@gmail.com
   * United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov

<div align="right">☐   Service information continued on attached page</div>

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ----, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

N/A

<div align="right">☐   Service information continued on attached page</div>

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 3, 2010**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**COURTESY COPY SERVED VIA ATTORNEY MESSENGER DELIVERY:**
Hon. Samuel Bufford
United States Bankruptcy Court
255 E. Temple Street, Ctrm 1575
Los Angeles, CA  90012          ☐     Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 3, 2010 | Angela Antonio | /s/ Angela Antonio |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

1